IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**AMANDA JEAN HAMLEY,**                       Case No.1:18 CV 268

    Plaintiff,

    v.                                           Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                      MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Amanda Jean Hamley ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in May 2014, alleging a disability onset date of March 18, 2010. (Tr. 193-96). Her claims were denied initially and upon reconsideration. (Tr. 108-10, 121-23). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 124). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on July 13, 2016. (Tr. 30-85). On December 22, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on February 2, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in March 1989, making her 21 years old on her alleged onset date. *See* Tr. 193. Plaintiff never worked (Tr. 44), and testified she was unable to because of short-term memory loss and distractibility (Tr. 45).

Plaintiff lived with her boyfriend, Edward Barkley, II, and her three children ranging in age from five years to newborn. (Tr. 37-38). She also had a nine-year-old daughter who did not live with her. (Tr. 47-48). Plaintiff had an eighth-grade education. (Tr. 38). She had trouble with reading, but could perform simple mathematics. (Tr. 40). Plaintiff did not have a driver's license and relied on Mr. Barkley for transportation. (Tr. 41).

Plaintiff stayed at home "all day" and described herself as a "couch potato". (Tr. 47). She socialized with Mr. Barkley, her father, her nine-year-old daughter, and her sisters. *Id*. Plaintiff did not get along with her mother and they rarely interacted. *Id*. She had a friend in Las Vegas with whom she talked on the phone. (Tr. 48).

Plaintiff rarely watched television, but often listened to music. (Tr. 49). She spent her day caring for the children, including diapering and feeding, though Mr. Barkley helped when he came home from work. (Tr. 54-55). Mr. Barkley did all the household chores. (Tr. 51). He grocery shopped, though she would sometimes pick up "simple stuff" such as diapers and formula. *Id*. Mr. Barkley did most of the cooking, but Plaintiff prepared simple meals for the children. (Tr. 52, 55).

Mr. Barkley testified that he and Plaintiff had been together three years, living together during most of that time, though there were brief periods where Plaintiff stayed elsewhere. (Tr. 69). When together, Mr. Barkley did the household chores, including cooking, cleaning, and

laundry. (Tr. 71). Plaintiff helped with chores "on occasion". *Id*. Plaintiff cared for the children: bathing, feeding, and diapering. (Tr. 71-72).

Mr. Barkley noted Plaintiff could be "explosive" at times when interacting with others, including family. (Tr. 73-74). He testified these incidents primarily occurred when Plaintiff was unmedicated. (Tr. 73).

Relevant Medical Evidence

In March 2013, Plaintiff underwent a consultative psychological evaluation with Mitchell Wax, Ph.D. (Tr. 1220-25). Plaintiff reported she was unable to work due to memory problems. (Tr. 1221). She was last under psychiatric care in December 2012 for attention deficit hyperactivity disorder ("ADHD"). *Id*. Plaintiff had prescriptions for Adderall and Zoloft but did not take the medications because she could not afford them. *Id*. She lived with a female friend. (Tr. 1222). Plaintiff cooked "daily", cleaned the house, and did laundry twice per month. *Id*. She always shopped for groceries with her roommate or boyfriend – never alone. *Id*. In a typical day, Plaintiff cared for her two-year-old, watched television, and spoke with friends; she visited a friend three times per week. *Id*. Plaintiff reported she was "cut off" from welfare because she could not maintain the employment it required. (Tr. 1224). Dr. Wax found she was "cavalier" on this subject and "presented with a sense of entitlement when talking about why she could not maintain her job". *Id*. Plaintiff told Dr. Wax that "[t]hey're just going to have to understand my daughter got sick and I chose to be home with her rather than go to work." *Id*.

On examination, Dr. Wax found Plaintiff "intellectually limited" – she often needed questions repeated or clarified. (Tr. 1222). Dr. Wax noted Plaintiff was "inappropriately breezy and spacey." *Id*. Plaintiff's speech was "vague and circumstantial," and she "intermittently appeared distant and faraway". (Tr. 1223). She appeared "anxious and fretful" during the

3

examination. *Id*. Plaintiff's full-scale IQ score was 89, placing her in the low average range. (Tr. 1224). Dr. Wax diagnosed attention deficit disorder ("ADD") combined type, and personality disorder (not otherwise specified). *Id*.

In August 2013, Plaintiff saw Lendita Haxhiu-Erhardt, M.D., in the psychiatry department at MetroHealth for a medication check. (Tr. 259-60). Plaintiff reported she was doing "OK", with improved concentration. (Tr. 260). On examination, Plaintiff was cooperative and oriented to time and place; she had a logical thought process, euthymic mood, full affect, and "sustained" concentration. *Id*. Dr. Haxhiu-Erhardt diagnosed ADD and a learning disability. *Id*. She prescribed Adderall and Zoloft. (Tr. 261). In October, Plaintiff reported she was no longer taking Adderall because she was pregnant. (Tr. 267). Plaintiff wanted to be placed back on Adderall because she was doing "very poorly" without it, explaining she could not function properly or focus. *Id*. On examination, Plaintiff had similar mental status findings. *Id*. Dr. Haxhiu-Erhardt continued Plaintiff's diagnoses and Adderall prescription. (Tr. 268). At a follow-up visit in December, Plaintiff reported she still "missed tasks" but not as much as without Adderall. (Tr. 274). On examination, Plaintiff was cooperative, oriented, had an anxious mood and constricted affect, and sustained concentration. *Id*. Dr. Haxhiu-Erhardt diagnosed ADD and depression; she continued Plaintiff's medications. *Id*.

Plaintiff returned to Dr. Haxhiu-Erhardt in January 2014. (Tr. 279). Plaintiff reported her medications helped and she was excited to have her baby. (Tr. 280). She was cooperative, had a logical thought process, anxious mood, constricted affect, and poor concentration. *Id*. Dr. Haxhiu-Erhardt continued Plaintiff's ADD diagnosis and medications. *Id*. In February, Plaintiff was concerned about the upcoming birth of her son because he had medical issues diagnosed in utero. (Tr. 287). Plaintiff was cooperative, had a logical thought process, euthymic mood, full affect, and

sustained concentration. *Id*. Dr. Haxhiu-Erhardt diagnosed ADD and continued Adderall. (Tr. 287-88). In March, Plaintiff reported she delivered her baby, but he was in the NICU. (Tr. 293). She was cooperative and had a logical thought process, but had paranoid thought content and an irritable mood and affect. *Id*. She had sustained concentration. *Id*. Her diagnosis and medications were continued. *Id*. In May 2014, Dr. Haxhiu-Erhardt found a similar mental status examination, and continued Plaintiff's diagnosis and medications. (Tr. 299).

In September 2015, Plaintiff reported to Dr. Haxhiu-Erhardt that she was pregnant again. (Tr. 1005). She was cooperative and oriented; she had spontaneous speech, a logical thought process, an anxious mood, and sustained concentration. (Tr. 1005-06). There was no evidence of paranoia. *Id*. Dr. Haxhiu-Erhardt diagnosed major depressive disorder ("MDD") and prescribed Zoloft and Latuda. (Tr. 1006). Plaintiff was not taking her medications at an October appointment. (Tr. 1030). She expressed frustration with her boyfriend. *Id*. Plaintiff was cooperative, oriented, had a logical thought process, anxious mood, full affect, and sustained concentration. *Id*. Dr. Haxhiu-Erhardt continued the MDD diagnosis and prescribed Adderall and Latuda. (Tr. 1030-31).

Plaintiff saw Dr. Haxhiu-Erhardt again in January 2016. (Tr. 1065). Plaintiff reported she remained distractible and anxious. *Id*. In February, Plaintiff was medication-compliant, denied any mood swings, and described herself as less anxious. (Tr. 1087). At both visits, Plaintiff was cooperative and oriented, had a logical thought process, irritable mood, full affect, and sustained concentration. (Tr. 1065-66, 1087-88).

<u>Opinion Evidence</u>

*Treating Physician*

In September 2014, Dr. Haxhiu-Erhardt completed a medical source statement. (Tr. 942-45). She found Plaintiff unable to complete an eight-hour workday without interruptions from

psychologically based symptoms; work in coordination with (or proximity to) others without being distracted by them; or maintain attention and concentration for extended periods. (Tr. 942-43). Plaintiff would be able to understand and remember short simple instructions for 60% of her workday; and carry out those instructions 40% of her workday. (Tr. 942). She could sustain an ordinary routine 30% of her workday; and perform at a consistent pace for 20% of her workday. (Tr. 943). Dr. Haxhiu-Erhardt based this opinion on Plaintiff's limited understanding and "severe, severe distractibility." *Id*. Plaintiff could interact appropriately with the public 70% of her workday; she could accept instruction, respond appropriately to criticism, respond appropriately to workplace changes, and get along with coworkers 20% of her workday. *Id*. She could maintain socially appropriate behavior and deal with ordinary work stress 30% of her workday. (Tr. 943-44). Dr. Haxhiu-Erhardt opined Plaintiff's limitations would be "lifelong". (Tr. 944). She listed Plaintiff's diagnoses as ADD, mood disorder, bipolar disorder, and developmental learning disorder (unspecified). (Tr. 945).

Dr. Haxhiu-Erhardt offered a second opinion in April 2016. (Tr. 965-68). Therein, Dr. Haxhiu-Erhardt found Plaintiff could understand, remember, and carry out short simple instructions 80% of her workday. (Tr. 965). She could sustain an ordinary routine; work in coordination with (or proximity to) others without being distracted; perform at a consistent pace; maintain attention and concentration for extended periods; interact with the public; accept instruction and criticism; maintain socially appropriate behavior; and respond to changes in the workplace for approximately 10-20% of her workday. (Tr. 965-66). She could not complete a normal workday without interruption from psychologically based systems. (Tr. 965). She could get along with coworkers for 80% of her workday. (Tr. 966). Plaintiff was unable to deal with ordinary work stress. (Tr. 967). Dr. Haxhiu-Erhardt based her opinion on Plaintiff's distractibility,

racing thoughts, and mood swings. (Tr. 966-67). Dr. Haxhiu-Erhardt listed Plaintiff's diagnoses as ADHD, inattentive type, and bipolar disorder. (Tr. 968).

*Examining Physician*

In March 2013, consultative examiner Dr. Wax opined Plaintiff had difficulty understanding, remembering, and carrying out instructions. (Tr. 1225). She was inattentive and needed questions simplified and repeated. *Id*. Dr. Wax found Plaintiff would have difficulty maintaining attention and concentration due to her ADD and low intelligence. *Id*. He believed she would be able to perform simple and multi-step tasks based upon her ability to care for her child and complete household chores. *Id*. Dr. Wax opined Plaintiff would not respond appropriately to supervisors and coworkers or work pressures due to her personality disorder. *Id*.

*Reviewing Physicians*

In August 2013, State agency psychologist Paul Tangeman, Ph.D., reviewed Plaintiff's medical file and provided a mental residual functional capacity assessment. (Tr. 91-94). He found Plaintiff was moderately limited in her ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence or pace. (Tr. 91). Plaintiff was not significantly limited in her ability to remember locations and work procedures; understand, remember, or carry out short simple instructions; perform on a schedule; sustain a routine without supervision; make simple work-related decisions; ask questions; maintain socially appropriate behavior; maintain awareness of hazards; travel; or set realistic goals. (Tr. 93-94). She was moderately limited in her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; work in coordination with (or proximity to) others; complete a normal workday without interruption from psychologically based symptoms; respond appropriately to supervisors; get along with coworkers; or respond to changes in the work

7

setting. *Id*. Dr. Tangeman found Plaintiff markedly limited in her ability to interact appropriately with the public. (Tr. 94). He noted Plaintiff "should avoid direct contact with the public" due to her personality disorder, but found she could maintain superficial conversation with coworkers and supervisors. *Id*. Further, Dr. Tangeman believed Plaintiff would perform best in a static environment where changes are predictable and explained. *Id*.

On reconsideration in February 2015, State agency psychologist Karla Voyten, Ph.D., found there was insufficient evidence to evaluate Plaintiff's mental impairments. (Tr. 104).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 80-85. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. (Tr. 81-82). The VE opined such an individual could perform jobs such as a dishwasher, cleaner, or a grocery bagger. *Id*.

ALJ Decision

In a written decision dated December 19, 2016, the ALJ found Plaintiff had not engaged in substantial gainful activity since her application date (April 1, 2014). (Tr. 12). She concluded Plaintiff had severe impairments of: ADD/ADHD, borderline intellectual functioning, and personality disorders. *Id*. The ALJ found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 13). The ALJ then set forth Plaintiff's residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: can perform simple, routine tasks, but not at a production rate pace; can have frequent interactions with supervisors, coworkers, and the public; is limited to routine workplace changes; and would need instructions explained verbally.

(Tr. 14). The ALJ found Plaintiff had no past relevant work (Tr. 20); was defined as a "younger individual" on the application date; and had a limited education. *Id*. The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. (Tr. 21). Thus, the ALJ found Plaintiff had not been under a disability since April 1, 2014 (the application date). (Tr. 22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the RFC finding does not include all of her mental health limitations because the ALJ did not properly evaluate her subjective symptoms, or perform a longitudinal evaluation of the evidence. (Doc. 11, at 15-17). Plaintiff also alleges the ALJ did not properly evaluate the opinion of Dr. Haxhiu-Erhardt. *Id*. at 20. The Commissioner responds that the RFC,

and the ALJ's analysis of Dr. Haxhiu-Erhardt's opinion, are supported by substantial evidence. (Doc. 15, at 6-7). For the reasons discussed below, the undersigned finds the ALJ's decision supported by substantial evidence and affirms the decision of the Commissioner.

RFC Generally

A claimant's RFC is defined as "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. § 416.927(e)(1)(i). However, it must be supported by substantial evidence. In formulating the RFC, the ALJ must consider and weigh medical opinions but is not required to adopt any physician's opinion verbatim. 20 C.F.R. §§ 416.929 and 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). Further, an ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929.

*Subjective Symptom Reports*

In formulating her RFC, the ALJ properly considered and cited several pieces of evidence, including Plaintiff's subjective symptoms. A claimant's assertions of disabling limitations are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531. In determining whether a claimant has disabling symptoms, the regulations require an ALJ to consider certain factors including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain, 6) any measures used to relieve pain, and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *7. Importantly, although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). Further, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).

The ALJ described the two-step process noted above, summarized Plaintiff's testimony, determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," then added:

> [T]he claimant's statements concerning the intensity, persistence and limited effect of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> There is medical evidence supporting the existence of the claimant's severe medical conditions as enumerated in finding two of this decision. However, the severity of the conditions as alleged by the claimant is not generally consistent with the objective medical evidence and other evidence and are, therefore, less likely to reduce her capacities to perform work-related activities.

(Tr. 15).

Throughout her opinion, the ALJ cited several reasons for discounting Plaintiff's subjective symptom statements – all of which are in-line with the factors an ALJ is required to consider under

the regulations. 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *7. In considering the objective evidence of record, the ALJ noted Plaintiff had relatively normal mental status examinations over time. (Tr. 19). Dr. Haxhiu-Erhardt often found Plaintiff cooperative and pleasant during her visits; she was oriented, had a logical thought process, and sustained concentration. (Tr. 260, 267, 274, 280, 287, 978-79, 1005-06, 1065-66, 1087-88). Importantly, the ALJ acknowledged there were times Plaintiff had negative changes in her mood and affect, however, these primarily occurred during times Plaintiff was not taking her medications, and she "appeared to improve when appropriately medicated and even admitted to doing well when she was on medications." (Tr. 19). This is supported by the record. *See* Tr. 267 (October 2013 visit with Dr. Haxhiu-Erhardt where Plaintiff requested to re-start Adderall because she was doing "very poorly" without it, explaining she could not function properly or focus); Tr. 274 (December 2013 visit where, after being placed back on Adderall, Plaintiff reported she still "missed tasks" but not as much as without the medication); Tr. 280 (January 2014 visit where Plaintiff reported that her medications were helping, and that she was excited to have her baby); Tr. 1087 (February 2016 visit where Plaintiff reported taking her medications, denied any mood swings, and described herself as less anxious). As noted above, it is proper for the ALJ to consider the effectiveness of Plaintiff's medications when assessing her subjective statements. 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *7.

The ALJ also considered Plaintiff's activities of daily living, finding Plaintiff had "moderate" restriction. (Tr. 13). In support, the ALJ cited Plaintiff's testimony that she cared for her children, socialized with family, did some household chores, and took "short/simple" grocery trips. (Tr. 13-15) (citing Tr. 47 (Plaintiff's testimony she socialized with family); Tr. 54-55 (Plaintiff's testimony she spent her day caring for her children); Tr. 51 (Plaintiff's testimony she

13

participated in "simple" grocery shopping)). During her 2013 consultative examination, Plaintiff told Dr. Wax that she cooked "daily", cleaned the house, and did laundry twice per month. (Tr. 1222). The ALJ properly considered these activities in assessing Plaintiff's subjective symptoms. 20 C.F.R. § 416.929(c)(3)(i); SSR 16-3p, 2017 WL 5180304, at *7.

Here, it is clear the ALJ did not rely on one piece of evidence when she found Plaintiff's statements regarding the severity of her symptoms not fully credible. Taken together, Plaintiff's mild objective findings, improvement with medication, and ability to perform many activities of daily living provide substantial evidence for the ALJ's subjective symptom evaluation.

*Record as a Whole / Longitudinal Analysis*

Within her RFC argument, Plaintiff asserts the ALJ erred because she did not consider the longitudinal evidence of record when formulating it. (Doc. 11, at 15). Listing 12.00 requires an ALJ to conduct a longitudinal analysis of Plaintiff's symptoms when evaluating disability based upon a mental impairment. 20 C.F.R. Pt. 404, Subpt. P, Listing 12.00(D)(1)(c)(2). As previously discussed, the ALJ noted Plaintiff had relatively normal mental status examinations over time. (Tr. 19). Dr. Haxhiu-Erhardt often found Plaintiff cooperative and pleasant during her visits; she was oriented, and often had a logical thought process. (Tr. 260, 267, 274, 280, 287, 978-79, 1005-06, 1065-66, 1087-88). Dr. Haxhiu-Erhardt also routinely noted Plaintiff was able to sustain concentration. *See id.* Importantly, as noted above, the ALJ acknowledged there were times Plaintiff had negative changes in her mood and affect, however, these primarily occurred during times Plaintiff was not taking her medications, and she "appeared to improve when appropriately medicated and even admitted to doing well when she was on medications." (Tr. 19) (citing Tr. 267, 274, 280, 1087). In addition to the positive and negative mental status examination findings, the ALJ also addressed Plaintiff's abilities in her activities of daily living. (Tr. 13). The ALJ

acknowledged Plaintiff performed several tasks on her own, yet needed still needed help with others. *Id*. The ALJ's findings here are accurate and supported by substantial evidence.

Plaintiff is dissatisfied with the ALJ's analysis of the record and argues the ALJ engaged in improper "cherry picking" – "only includ[ing] portions of the psychiatrist's medical records that showed [Plaintiff] in a capable light." (Doc. 14, at 4). The problem with a cherry-picking argument is that it runs both ways. Plaintiff argues the ALJ only focused on the positives, whereas her brief emphasizes the negatives. Crediting Plaintiff's argument here would require the Court to re-weigh evidence – which it cannot not do. *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

Although Plaintiff points to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. For these reasons, the undersigned finds the ALJ's decision in this regard supported by substantial evidence.

<u>Treating Physician</u>

Plaintiff next argues the ALJ failed to give the required "good reasons" for not assigning controlling weight to the opinion of Plaintiff's treating psychiatrist, Dr. Haxhiu-Erhardt. (Doc. 20, at 20-22). As an initial matter, medical opinions of treating physicians are generally accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242

(6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188.[1] A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)). The ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5.

As noted above, Dr. Haxhiu-Erhardt offered two medical source statements. (Tr. 942-45, 965-68). The ALJ addressed both opinions together and assigned them "little weight" because:

> They were largely completed on forms where answers were circled and only very briefly explained in a couple of lines. Additionally, the claimant had relatively normal mental statuses over time that exhibited changes in mood and affect with rare issues with thought content and attention/concentration, especially when medication was discontinued. The claimant was able to sustain concentration at times, as noted during different appointments throughout the record. Additionally, she was able to be cooperative and pleasant during treatment and examinations. Relationships when reported seemed to be okay. Additionally, the claimant's significant difficulties that were opined in dealing with crow[d]s and needing to miss excessive work w[]ere not supported within the medical evidence of record. Overall, the claimant's concentration abilities varied as did her moods, though she appeared to improve when appropriately medicated and even admitted to doing well when she was on medications.

(Tr. 19).

In support of her decision to assign the opinions "little weight", the ALJ cited several pieces of evidence. First, she found the forms Dr. Haxhiu-Erhardt used contained only brief explanations of the Doctor's assessments. *Id*. Plaintiff asserts this was an improper reason for rejecting the

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

16

opinion. (Doc. 11, at 22). However, many courts have found it proper for an ALJ to discount a "check box" form she finds conclusory, brief, or unsupported by the record as a whole. *See e.g., Hernandez v. Comm'r of Soc. Sec.,* 644 F. App'x 468, 474 (6th Cir. 2016) (upholding the ALJ's discounting of a treating physician's check box form where it was unaccompanied by any explanation, specifically, whether the limitations applied to Plaintiff when she was on, or off, her medications); *Batson v. Comm'r of Soc. Sec*., 359 F.3d 1190, 1195 (9th Cir. 2004) (upholding the ALJ's discounting of a treating physician's check list form where it was unsupported by objective evidence, contradicted by other evidence, and based primarily on subjective descriptions of pain); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Supportability is also contemplated under the regulations. *See* 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Here, as the ALJ noted, Dr. Haxhiu-Erhardt's opinions were on "check box" style forms (where her answers were circled instead of "checked"), and she provided very limited explanation for her findings, other than often repeating Plaintiff's subjective symptoms ("forgetful", "racing thoughts"), diagnoses, or medications. (Tr. 942-45, 965-68). Thus, the undersigned finds this is a valid for discounting Dr. Haxhiu-Erhardt's opinions.

In support of her decision to assign Dr. Haxhiu-Erhardt's opinions "little weight", the ALJ again noted Plaintiff had relatively normal mental status examinations over time. (Tr. 19). For example, Dr. Haxhiu-Erhardt often found Plaintiff cooperative and pleasant during her visit; she was oriented, had a logical thought process, and was repeatedly able to maintain sustained concentration. (Tr. 260, 267, 274, 280, 287, 978-79, 1005-06, 1065-66, 1087-88). These examination findings conflict with Dr. Haxhiu-Erhardt's opinion that Plaintiff would have severe

17

difficulties maintaining attention and concentration. (Tr. 942-43, 965-66). As discussed above in detail, the ALJ acknowledged there were times Plaintiff had negative changes in her mood and affect, however, these occurred during times Plaintiff was not taking her medications, and she "appeared to improve when appropriately medicated and even admitted to doing well when she was on medications." (Tr. 19). And an ALJ does not err where, as here, her finding that Plaintiff improved while on medication, is supported by the record. *See Sinegar v. Comm'r of Soc. Sec.*, 2014 WL 861104, at *6 (N.D. Ohio) (ALJ's decision to assign little weight to a treating physician was supported, in part, by psychological symptom improvement on medication); *see also Rogers v. Comm'r of Soc. Sec.*, 2015 WL 2097677, at *7 (N.D. Ohio) (ALJ's assessment of a treating psychiatrist opinion was supported, in part, by improvement when taking prescribed medication).

Plaintiff further argues the ALJ failed to consider (and incorporate into the RFC) that she would have "excessive absences". (Doc. 11, at 22-23). The ALJ acknowledged Dr. Haxhiu-Erhardt proffered this opinion, Tr. 19 (citing Tr. 944, 967), but found "the claimant's . . . needing to miss excessive work [was] not supported within the medical evidence of record" (Tr. 19). Plaintiff argues the ALJ "offered no evidence or explanation for th[is] finding," yet points to no evidence to rebut the ALJ's conclusion other than the "very close" relationship between she and Dr. Haxhiu-Erhardt. (Doc. 11, at 21). However, as the Commissioner correctly pointed out – Plaintiff points to no evidence to support the absenteeism conclusion. (Tr. 19). Thus, it was properly discounted.

In sum, the undersigned finds the ALJ's analysis of Dr. Haxhiu-Erhardt's opinions supported by substantial evidence.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

                                             s/James R. Knepp II
                                             United States Magistrate Judge